## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HEALTHPLANCRM, LLC d/b/a CAVULUS, | ) ) ) ) 2:19-cv-1357-NR |
| Plaintiff, | ) ) ) ) |
| v. | ) ) |
| AVMED, INC. d/b/a AVMED HEALTH PLANS and NTT DATA SERVICES, LLC, | ) ) ) ) ) |
| Defendants. | ) ) ) |

## <u>OPINION</u>

**J. Nicholas Ranjan, United States District Judge**

Plaintiff Cavulus is in the business of licensing cloud-based "customer relation management" software to insurance companies managing Medicare Advantage plans. In this lawsuit, Cavulus seeks to compel a licensee (Defendant AvMed) and sub-licensee (Defendant NTT) to arbitrate trade-secret claims arising from their use of Cavulus's software. Cavulus argues that AvMed and NTT are bound by its License and End-User Agreements, which each include an identical arbitration clause. Both Defendants oppose Cavulus's motion, but for different reasons. AvMed admits that it is bound by the Agreements but argues that this Court lacks personal jurisdiction over it and that the parties delegated questions of arbitrability to the arbitrator. NTT, on the other hand, argues that it never contracted with Cavulus, and thus never agreed to arbitrate anything at all.

After carefully considering the parties' arguments, the Court largely agrees with Cavulus. First, the Court can exercise personal jurisdiction over AvMed. By agreeing to arbitrate disputes in Allegheny County, AvMed has

waived any jurisdictional objection to litigating disputes related to the parties' arbitration agreement in this District.  Second, both AvMed and NTT are bound by the arbitration clause in the Agreements.  AvMed is bound because it negotiated and entered into the Agreements and does not dispute their validity.  NTT, on the other hand, is bound by equitable estoppel and also because it independently accepted the End-User Agreement by accessing and using Cavulus's software in the face of conspicuous browsewrap language.

On one issue, however, AvMed makes a good point—the parties' incorporation of AAA arbitration rules in their contract is, based on the precise contractual language here, a "clear and unmistakable" delegation of arbitrability issues to the arbitrator.  While the Court rejects the notion that incorporation of AAA rules always operates as a "clear and unmistakable" delegation of that authority, the explicit language of the parties' contract leaves no room for ambiguity here.  AvMed must raise any objections to the arbitrability of Cavulus's claims in arbitration.

Thus, the Court holds that a valid arbitration agreement exists between the parties and will, therefore, grant Cavulus's motion; except that the arbitrator, not the Court, must decide any objections to the arbitrability of specific claims.

## **BACKGROUND**

In September 2008, Cavulus and AvMed entered into a License Agreement. [ECF 21 at ¶¶ 18-19 & Ex. 1 § 3].  NTT was not a party to the Agreement and had no relationship with AvMed when the License Agreement was executed.  Cavulus and AvMed extended and amended the License Agreement several times, until the last extended term expired on September 30, 2019.  [*Id.* at ¶ 23 & Exs. 3, 4, 5].

Under the License Agreement, Cavulus granted AvMed a license to use its "MedicareCRM" software platform for AvMed's Medicare Advantage business. [*Id.* at ¶¶ 13, 18-19]. Cavulus describes its software as a cloud-based "customer relation management platform." The License Agreement came with a related "End-User Agreement," attached to the License Agreement as Exhibit A and incorporated-by-reference into that Agreement. [*Id.* at ¶ 18 & Ex. 1 § 1(a)]. Both the License and End-User Agreements included a section entitled "<u>Controlling Law; Arbitration</u>," which provided that Pennsylvania law would govern the Agreements, and that any "dispute, claim or controversy of any kind … shall be resolved exclusively by binding arbitration in Allegheny County, Pennsylvania in accordance with the Commercial Arbitration Rules of the American Arbitration Association." [*Id.* at ¶¶ 22, 36, Ex. 1 § 11(e), Ex. 2 § 8]. This arbitration clause reads in full:

> <u>Controlling Law; Arbitration</u>. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania without regard to its choice of law provisions. Any dispute, claim or controversy of any kind arising in connection with or relating to this Agreement or performance hereunder shall be resolved exclusively by binding arbitration in Allegheny County, Pennsylvania in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in effect, by one (1) arbitrator appointed in accordance with said rules. Judgment on the award rendered by the arbitrator may be entered into any court of competent jurisdiction. Notwithstanding the foregoing, it is understood and agreed that any breach of Section 7 of this Agreement by either party will cause irreparable harm and damage to the non-breaching party which may not adequately be compensated by money damages and, therefore, the non-breaching party shall be entitled to injunctive relief in addition to any other remedies provided by law or in equity for any such breach.

[*Id.* at Exs. 1 § 11(e) & 2 § 8].

The arbitration clause contained in the End-User Agreement differs only in that the last sentence refers to "any breach of Section 4 of this Agreement by End-User," [*Id.* at Ex. 2 § 8], rather than "Section 7 of this Agreement by either party." [*Id.* at Ex. 1 § 11(e)].[1]

At some point in 2018, AvMed decided to replace Cavulus as its CRM platform provider and contracted with another company, Salesforce, to provide a replacement CRM product. [*Id.* at ¶ 25]. As part of this transition, AvMed needed to transfer customer information stored on Cavulus's platform to the new Salesforce platform. [*Id.* at ¶ 27].

Typically, in such situations, Cavulus provides its customers with the stored information in an electronic format requested by the customer. [*Id.*]. Cavulus does not allow customers to discover, transfer, or export the "unique characteristics of the Cavulus MedicareCRM platform." [*Id.*]. This time, however, AvMed insisted on engaging NTT to transition its historical data. [*Id.* at ¶ 28]

To do so, it granted NTT a sublicense to access Cavulus's software. [*Id.*]. This sublicensing was contemplated by Section 1(a) of the License Agreement, which authorized AvMed to "sub-license" use of Cavulus's software to "its employees, independent contractors or agents," who the Agreement defines as "End-Users." [*Id.* at Ex. 1 § 1(a)]. The same provision specifies that such "End-Users shall be bound for the benefit of [Cavulus] to the terms of the End-User

---

[1] Notably, the reference to "Section 4" in the End-User Agreement is almost certainly a typo, as the License Agreement makes clear that the final sentence of this provision is intended to refer to the "Confidentiality" provision of the Agreement, and Section 4 is a provision purporting to limit Cavulus's liability to its end-user. The analogous "Confidentiality" provision of the End-User Agreement is Section 3. To the extent that this typo has any significance at all, it would be only to arbitrability objections that, as discussed below, the Court determines that the arbitrator must decide.

Agreement … by executing a 'click-on' version of the same agreement." [*Id.* at ¶¶ 19-20].

On November 26, 2018, AvMed sent Cavulus a "Limited Letter of Agency," providing notice that it intended to authorize NTT to access Cavulus's software. [*Id.* at ¶ 29 & Ex. 6]. Specifically, the letter advised Cavulus that NTT was "authorized to act on behalf of AvMed with regard to the products and/or services that are owned, leased, or licensed by AvMed," including "supporting and operating the products and/or services provided to AvMed from [Cavulus] … under the current agreement(s) … between [Cavulus] and [AvMed]." [*Id.* at ¶ 29 & Ex. 6]. AvMed copied NTT's "Senior IT Executive," Fouad Bensellam, and "Senior Business Development Executive," Viji Shankar, on its letter. [*Id.* at ¶ 31 & Ex. 6].

On March 11, 2019, NTT began accessing Cavulus's software platform to identify AvMed's historical customer data and transfer it to Salesforce. [*Id.* at ¶ 32]. Between March 11, 2019 and June 12, 2019, NTT employees accessed the Cavulus platform over 75 times. [*Id.* at ¶¶ 32, 35, Ex. 8]. Each time NTT employees accessed the Cavulus software platform they were directed to a secure log-in page, which required them to enter their individual user ID and password to access the software. [*Id.*].

The secure log-in page states: "Use of Cavulus constitutes acceptance of the <u>End User License Agreement</u>." [*Id.* at ¶ 34 & Ex. 7] (emphasis original). Clicking on the "<u>End User License Agreement</u>" hyperlink takes the user to the same End-User Agreement referenced in the AvMed License Agreement. [*Id.* at ¶ 35]. This language was displayed on the log-in page each time it was visited and accessed by an NTT employee (or any other user). [*Id.* at ¶ 33]. And Cavulus's software cannot be accessed without first visiting the log-in page. [*Id.* at ¶ 34].

At some point, Cavulus "uncovered" NTT employees "reviewing the platform to copy its customized and proprietary workflows and functionalities and recreate them on a generalized CRM platform, such as Salesforce, for AvMed or other clients." [ECF 27 at p. 7; ECF 21 at ¶¶ 39-52]. After making this discovery, Cavulus initiated AAA arbitration by filing a Demand for Arbitration against AvMed and NTT on July 19, 2019. [ECF 21 at ¶ 55 & Ex. 9]. In its Demand, Cavulus sought relief for: (1) AvMed's alleged breach of the License Agreement and End-User Agreement; (2) NTT's alleged breach of the End-User Agreement; (3) AvMed and NTT's alleged theft of Cavulus's trade secrets, and; (4) violations of the Pennsylvania Uniform Trade Secrets Act.

After NTT refused to participate in arbitration and AvMed raised an objection to the arbitrability of Cavulus's claims, Cavulus filed this suit to compel arbitration in the Allegheny County Court of Common Pleas. [*Id.* at ¶¶ 57-59]. AvMed and NTT jointly removed the case to this Court on October 21, 2019. [ECF 1]. Cavulus then filed an amended complaint on October 30, 2019 and, per this Court's scheduling order, a motion to compel arbitration on November 6, 2019. [ECF 21; ECF 23; ECF 25]. At the request of all parties, the Court issued an order staying the arbitral proceedings, pending its decision on Cavulus's motion, on October 31, 2019. [ECF 24].

## STANDARD OF REVIEW

This dispute concerns an arbitration agreement in an interstate commercial contract, and so is governed by the Federal Arbitration Act. *See Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005). The standard of review that applies to a motion to compel arbitration under the FAA can differ depending on the circumstances.

In some cases, the arbitrability of claims is "apparent on the face of a complaint or . . . documents relied upon in the complaint." *Sanford v. Bracewell*

- 6 -

*& Guiliani, LLP*, 618 F. App'x 114, 117 (3d Cir. 2015) (cleaned up).  When it is, "a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay."  *Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 776 (3d Cir. 2013) (quotations and citations omitted).

But if, instead, a motion to compel arbitration "is not based on a complaint with the requisite clarity to establish arbitrability," or "the opposing party has come forth with reliable evidence that is more than a naked assertion . . . that it did not intend to be bound by the arbitration agreement, even though on the face of the pleadings it appears that it did," then "resort to discovery and Rule 56 is proper."  *Sanford*, 618 F. App'x at 117 (cleaned up); *see also Guidotti*, 716 F.3d at 776.

Here, the parties disagree about what standard should apply.  Cavulus argues that the Court should apply a Rule 12(b)(6) standard because it "does not need to consider facts outside of Cavulus's First Amended Complaint, and the documents relied upon therein, to determine that AvMed and NTT entered into valid arbitration agreements with Cavulus, and that the relevant agreements cover the scope of this dispute."  [ECF 27 at p. 11].  NTT suggests that a Rule 56 standard should apply, because the complaint "do[es] not provide a sufficient factual basis for determining whether the parties entered into an agreement to arbitrate."  [ECF 28 at pp. 4-5].  And AvMed takes no position either way. *See generally* [ECF 29].

Further complicating things is the "reversed" posture of the parties in this case.  Unlike most cases, the plaintiff here is the one seeking to compel arbitration.  The Third Circuit's cases discussing the appropriate standard of review envision a scenario where a plaintiff files its claims in court and the defendant responds with a motion to compel arbitration.  Under that more

familiar scenario, applying a Rule 12(b)(6) standard of review to test the plausibility of the allegations in the complaint is more natural.

But in this case, Cavulus is the plaintiff and also the one affirmatively moving to compel; it filed this action in order to compel the case to arbitration. Under this scenario, it seems odd to apply a Rule 12(b)(6) standard to accept as true the allegations in the complaint of the party that is also moving to effectively dismiss this action.

Nevertheless, the Court ultimately agrees with Cavulus—Rule 12(b)(6) provides the correct standard, even in light of the somewhat unusual posture of the parties. Cavulus's arguments depend only on the allegations in its complaint and the documents attached. *See Silfee v. Automatic Data Processing, Inc.*, 696 F. App'x 576, 579 (3d Cir. 2017) ("Those legal questions—based entirely on documents attached to the complaint—do not require additional discovery.") (citation omitted).[2] In response to Cavulus's arguments, NTT has not presented evidence or otherwise identified any relevant category of information outside the record requiring the Court to pierce the pleadings in order to determine whether a valid arbitration agreement exists. Nor has NTT requested that the Court permit any discovery before deciding Cavulus's motion.

At most, NTT attaches a declaration from its in-house counsel, Christopher Stidvent. [ECF 28 at Ex. 1]. In it, Mr. Stidvent asserts that NTT "understands" that Cavulus alleges NTT employees "logged onto a software

---

[2] Cavulus does attach a declaration from one of its counsel, Kevin J. English, to its motion. [ECF 26]. But Cavulus asserts that the declaration "substantially follows" the complaint, and is intended only to "add[] clarification." [ECF 27 at p. 11 n. 1]. Upon review, the Court sees no need to consider or rely on that declaration, as opposed to the complaint itself and the documents referenced in and attached to the complaint, and so will disregard the declaration.

system provided by Cavulus." [*Id.*].  He then claims, based on his "familiar[ity] with the rules concerning which [NTT] employees have the authority to sign contracts," that the employees identified by Cavulus as accessing its software lack authority "to bind [NTT] to a software sub-license agreement or to an arbitration agreement." [*Id.*].

True or not, this assertion does not raise any real fact issue that would compel application of a summary-judgment standard—it is merely legal argument repackaged in the form of a declaration.  Indeed, the question of whether NTT is bound to a contract by the actions of its employees turns on agency law, rather than NTT's assertion that it did not subjectively consider those employees to have the legal authority to bind it.  *Cf. Uhar & Co. v. Jacob*, 840 F. Supp. 2d 287, 291 (D.D.C. 2012) ("[T]he court gives very little weight to the defendant's self-serving characterization of the parties' legal relationship.") (citation omitted).  Even so, the Court will err on the side of caution and assume for purposes of this motion that the NTT employees who used Cavulus's software were ordinary, non-managerial employees with no special authority to bind NTT beyond that which any ordinary employee or agent might have under applicable law.

With that precaution, the Court will decide the motion "under a Rule 12(b)(6) standard without discovery's delay." *Guidotti*, 716 F.3d at 776 (quotations and citations omitted).  When applying a Rule 12(b)(6) standard to a motion to compel arbitration, the Court considers "only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." *Somerset Consulting, LLC v. United Capital Lenders, LLC*, 832 F. Supp. 2d 474, 482 (E.D. Pa. 2011) (quotations and citations omitted).  The Court will then "accept as true the factual allegations set forth in the [c]omplaint" and "consider the substance of the

- 9 -

contracts that ostensibly compel arbitration." *CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 168 n.2 (3d Cir. 2014).  If the existence of an agreement to arbitrate is "apparent on the face of [the] complaint [or the] . . . documents relied upon in the complaint," the Court will grant Cavulus's motion. *Guidotti*, 716 F.3d at 773-74 (quotations and citations omitted).

Finally, that the parties are basically "reversed" from the more common posture does not change what standard applies.  That is, Calvulus is the plaintiff, but the Court can and will still apply a Rule 12(b)(6) standard.  In a certain sense, this is no different than deciding the present motion as if it were a motion for judgment on the pleadings under Rule 12(c).  The Court can accept as true all allegations in all parties' submissions, and, like a MJOP, apply a Rule 12(b)(6) standard.  *See Revell v. Port Auth. of N.Y., N.J.*, 598 F.3d 128, 134 (3d Cir. 2010) ("A motion for judgment on the pleadings based on the defense that the plaintiff has failed to state a claim is analyzed under the same standards that apply to a Rule 12(b)(6) motion.") (citation omitted).[3]

## DISCUSSION & ANALYSIS

Both AvMed and NTT oppose Cavulus's motion, but for different reasons. AvMed does not dispute that it "formed an agreement to arbitrate certain disputes" with Cavulus.  Instead, it argues that this Court lacks personal jurisdiction and, alternatively, that the parties agreed that the arbitrator, not the Court, would decide whether Cavulus's claims fall within the scope of the

---

[3] No matter if a Rule 56 or Rule 12(b)(6) standard applies, the substantive analysis below would remain the same and the outcome would not change. That is because: (1) the Court's decision relies only on undisputed facts; (2) NTT has not requested discovery or expressed any desire to present evidence, other than the employee declaration attached to its briefing; and (3) despite their disagreement on the appropriate standard to be applied, neither Cavulus nor NTT argues that, or identifies any way in which, changing the applicable standard of review would make a difference to their other arguments.

arbitration clause.  NTT, for its part, raises the more fundamental objection that it never contracted with Cavulus and, thus, did not agree to arbitrate anything at all.  The Court will address each Defendant's arguments in turn, starting with AvMed.

## I.   AvMed is bound to the arbitration agreement, but the arbitrability of Cavulus's claims is for the arbitrator to decide.

AvMed's arguments implicate the Court's power to *enforce* AvMed's arbitration agreement with Cavulus; not the existence of the arbitration agreement itself.  For the following reasons, the Court finds that it can properly exercise personal jurisdiction over AvMed, and thus enforce the arbitration agreement, but that the parties agreed in their contract that the arbitrator should decide if the specific claims asserted by Cavulus are arbitrable (*i.e.*, fall within the scope of the arbitration agreement).

### A.   AvMed consented to personal jurisdiction by agreeing to arbitrate disputes in Allegheny County.

AvMed first argues that it is not subject to personal jurisdiction in Pennsylvania because it has "no affiliation with Pennsylvania," and personal jurisdiction cannot rest "solely on the forum selection clause in the parties' contract."  [ECF 29 at pp. 4, 6].  If AvMed were correct, the lack of personal jurisdiction would require the Court to dismiss the case.  *See Aetna Inc. v. Insys Therapeutics, Inc.*, 324 F. Supp. 3d 541, 549 (E.D. Pa. 2018) ("[A] court must grant a defendant's motion to dismiss if the court lacks personal jurisdiction over the defendant.").  But AvMed is wrong.

"It is well established that personal jurisdiction is a waivable right." *Sam Mannino Enters., LLC v. John W. Stone Oil Distrib., LLC*, 26 F. Supp. 3d 482, 485 (W.D. Pa. 2014) (Gibson, J.) (citation omitted).  Relatedly, "a party may consent to personal jurisdiction where such jurisdiction might otherwise not

exist in a number of ways." *Senju Pharm. Co. v. Metrics, Inc.*, 96 F. Supp. 3d 428, 436 (D.N.J. 2015). These "ways" include "[a] variety of legal arrangements" that "have been taken to represent express or implied consent to the personal jurisdiction of the court." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982). Of relevance here, "federal courts have found such consent implicit in agreements to arbitrate." *Id.* (citation omitted). And to that end, Cavulus argues that "by agreeing to arbitrate in [Allegheny County]," AvMed "consented to the jurisdiction of courts in that location for litigation of matters arising out of the arbitration." The Court agrees.

It is true that the Third Circuit has not "directly resolved the issue of whether personal jurisdiction may be exercised over a defendant based on its agreement to arbitrate all disputes in a specific venue." *Silec Cable S.A.S. v. Alcoa Fjardaal, SF*, No. 12-01392, 2012 WL 5906535, at *11 (W.D. Pa. Nov. 26, 2012) (Fischer, J.). It has, however, suggested in dicta that it would find consent to personal jurisdiction inherent in an arbitration agreement; stating that an agreement to arbitrate in a specific location "would probably—and properly—be regarded as a waiver of objections to judicial jurisdiction [in that location] as well." *BP Chemicals Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 261–62 (3d Cir. 2000).

The Courts of Appeals for at least the First, Second, Fifth, Sixth, and Eighth Circuits have agreed; each holding that, by agreeing to arbitrate in a particular forum, parties "impliedly consen[t] to the jurisdiction of courts in that location for litigation of matters arising out of the arbitration given that those courts have jurisdiction under the FAA … to compel arbitration." *Silec Cable*, 2012 WL 5906535, at *11 (citation omitted); *see Ford Dealer Computer Servs., Inc. v. Fullerton Motors, LLC*, 42 F. App'x 770, 771 (6th Cir. 2002); *St.*

*Paul Fire & Marine Ins. Co. v. Courtney Enters., Inc.*, 270 F.3d 621, 624 (8th Cir. 2001); *PaineWebber Inc. v. Chase Manhattan Private Bank (Switzerland)*, 260 F.3d 453, 461 (5th Cir. 2001); *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 979 (2d Cir. 1996); *Unionmutual Stock Life Ins. Co. of Am. v. Beneficial Life Ins. Co.*, 774 F.2d 524, 527 (1st Cir. 1985).

The Court finds this authority persuasive, as has at least one other judge in this District. *See Silec Cable*, 2012 WL 5906535, at *11; *see also Armstrong Dev. Props., Inc. v. Ellison*, No. 13-1590, 2014 WL 1452322, at *6 n. 8 (W.D. Pa. Apr. 14, 2014) (Fischer, J.) (interpreting *Silec Cable* as standing for the "principle that a party to . . . an arbitration agreement necessarily consents to the personal jurisdiction of the District Court nearest to the stated location of the arbitration for cases arising out of the parties' arbitration, such as a motion to compel arbitration and/or to enforce an arbitration award."). Indeed, as the Eighth Circuit observed in *Courtney Enterprises*, "if the court in the selected forum did not have personal jurisdiction to compel arbitration, the agreement to arbitrate would be effectively unenforceable, contrary to the strong national policy in favor of arbitration." 270 F.3d at 624.

That is because Section 4 of the FAA provides that, when a petition to compel arbitration is granted, the arbitration "hearing and proceedings . . . shall be within the district in which the petition for an order directing such arbitration is filed." 9 U.S.C. § 4. Most courts interpreting this language have inferred from it that "where the parties have agreed to arbitrate in a particular forum only a district court in that forum has jurisdiction to compel arbitration under [Section] 4." *Ansari v. Qwest Commc'ns Corp.*, 414 F.3d 1214, 1219–20 (10th Cir. 2005) (collecting cases); *see also Port Erie Plastics, Inc. v. Uptown Nails, LLC*, 173 F. App'x 123, 128 (3d Cir. 2006) ("[T]he majority of district courts … have held that they lacked authority to compel arbitration at all, even

in their own districts, when [an] agreement specifies that arbitration is to take place in a different venue.").  In other words, where contracting parties have agreed to arbitrate in a particular location, jurisdiction to enforce that agreement is likely to either exist in the district encompassing that location or not at all.

Given these considerations, this Court sees no reason to diverge from the broad, judicial consensus that an agreement to arbitrate in a particular forum implies consent to the jurisdiction of the corresponding district court—though only for all "cases arising out of the parties' arbitration, such as a motion to compel arbitration and/or to enforce an arbitration award."  *Armstrong*, 2014 WL 1452322, at *6 n.8.

AvMed's main argument against enforcement of a forum-selection clause is that such a clause, standing alone, isn't enough to confer personal jurisdiction.  [ECF 29 at pp. 5-7].  AvMed, citing the Supreme Court's decisions in *Bristol-Meyers Squibb* and *Burger King*, argues that "other relevant factors" must also be considered, such as the burden to AvMed of litigating away from home.  [*Id.* at p. 6].  But that's not quite right.

*Bristol-Meyers Squibb* and *Burger King* stand for the proposition, in part, that a contractual relationship alone is insufficient to create minimum contacts.  *See Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773, 1783 (2017) ("The bare fact that BMS contracted with a California distributor is not enough to establish personal jurisdiction in the State."); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985) ("If the question is whether an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot.").  So, as applied here, those decisions hold that just because AvMed entered into

the License Agreement with Cavulus (a Pennsylvania-based company), that alone doesn't confer personal jurisdiction. But that's materially different than the current situation where the contract has a forum-selection clause, and in that contractual clause, a party (AvMed) specifically consents to or waives objections to personal jurisdiction.

The Supreme Court long ago recognized that such a forum-selection clause, standing alone, satisfies due process and creates personal jurisdiction. *See Burger King*, 471 U.S. at 473 n.14 ("We have noted that, because the personal jurisdiction requirement is a waivable right, there are a variety of legal arrangements by which a litigant may give express or implied consent to the personal jurisdiction of the court. For example, particularly in the commercial context, parties frequently stipulate in advance to submit their controversies for resolution within a particular jurisdiction. Where such forum-selection provisions have been obtained through freely negotiated agreements and are not unreasonable and unjust, their enforcement does not offend due process.") (cleaned up). The burden to AvMed and the traditional personal-jurisdiction considerations are irrelevant when a party has consented to jurisdiction in a forum based on a forum-selection clause. And that consent is what "federal courts have found … implicit in agreements to arbitrate." *Ins. Corp. of Ireland*, 456 U.S. at 703.

But even if this Court were to consider the burden to AvMed, it is unclear what burden it really faces, beyond what it has already faced (*i.e.*, resisting a motion to compel arbitration, which is now water under the bridge). Cavulus does not assert any substantive claims against AvMed; it seeks only to compel AvMed to arbitrate claims in Allegheny County (as AvMed admits it agreed to do). There will be no additional litigation in this case after today. As a result, even considering the burden to AvMed, the Court finds that AvMed faces no

- 15 -

such ongoing burden and that it has necessarily consented to personal jurisdiction in the Western District of Pennsylvania for all cases "arising out of the parties' arbitration," including this one. *Armstrong*, 2014 WL 1452322, at *6 n.8.

## B.   The parties "clearly and unmistakably" delegated questions of arbitrability to the arbitrator.

AvMed's second argument is that the Court may not determine whether Cavulus's claims fall within the scope of the arbitration clause, because the parties delegated questions of whether particular claims are arbitrable to their chosen arbitrator.  [ECF 29 at pp. 7-11].  AvMed says they did so by agreeing, in Section 8 of the License Agreement and Section 8(b) of the End-User Agreement, that their arbitration will take place "in accordance with" the AAA's "Commercial Arbitration Rules."  [*Id.* at p. 9].  According to AvMed, the incorporation of AAA rules constitutes implicit agreement to delegate arbitrability questions to the arbitrator, because those rules provide that the arbitrator "shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."  [*Id.*] (citing AAA Commercial Arbitration Rule R-7(a) (2013), *available at* www.adr.org/commercial).

AvMed has made clear that it wishes to argue, to the arbitrator, that Cavulus's claims are not arbitrable, including that Cavulus's request for injunctive relief falls outside the scope of the arbitration clause.  Though AvMed does not preview its arguments in any detail, those details don't matter. For this motion, the Court is concerned only with the threshold question of who must decide whether Cavulus's claims are arbitrable—the arbitrator or the

Court?  Based on the precise language of the contract here, the Court agrees with AvMed that the arbitrator must decide.

Generally, there is a presumption that courts decide questions related to arbitrability—*i.e.*, whether a certain dispute falls within the scope of an arbitration clause.  *See Puleo v. Chase Bank USA, N.A.*, 605 F.3d 172, 187 (3d Cir. 2010) ("[T]he general rule is that questions of arbitrability are for the court to resolve . . .").  Parties can agree to delegate this decision to an arbitrator instead, but because of the presumption, the delegation must be "clear and unmistakable."  *See Opalinski v. Robert Half Int'l Inc.*, 761 F.3d 326, 335 (3d Cir. 2014) ("It is presumed that courts must decide questions of arbitrability unless the parties clearly and unmistakably provide otherwise.") (cleaned up).  In other words, if the contract leaves any doubt about the parties' intent, the Court decides the arbitrability issue.

The Third Circuit has described this "clear and unmistakable" standard as "onerous," and required an "express" and "unambiguous" expression of intent to arbitrate arbitrability in order to satisfy it.  *See Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 753 (3d Cir. 2016).  Indeed, the word "onerous" appears 14 times throughout the Third Circuit's opinion in *Chesapeake.  See generally id.*  So, the question here is whether the incorporation by reference of AAA arbitration rules is a sufficiently "clear and unmistakable" delegation to meet that "onerous" test.

Most courts have found that it is.  *See, e.g., McGee v. Armstrong*, 941 F.3d 859, 866 (6th Cir. 2019); *Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522, 538 (5th Cir. 2019).[4]  In general, these courts

---

[4] *See also Zabokritsky v. JetSmarter, Inc.*, No. 19-273, 2019 WL 2563738, at *4 (E.D. Pa. June 20, 2019); *Vertiv Corp. v. Svo Bldg. One, LLC*, No. 18-1776, 2019 WL 1454953, at *2 (D. Del. Apr. 2, 2019); *loanDepot.com v. Crosscountry*

have reasoned that incorporation of AAA commercial rules by reference reflects a "clear and unmistakable" delegation of arbitrability questions to the arbitrator, because AAA Commercial Rule 7 purports to give the arbitrator the "power" to decide his or her own jurisdiction. *See, e.g., Halliburton*, 921 F.3d at 537 ("One such rule is Rule 7(a) of the American Arbitration Association's ('AAA') Commercial Arbitration Rules. Rule 7(a) provides that '[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.'").

What's troubling to the Court, however, is that many of these decisions simply state, without much analysis, that incorporation of AAA rules is a sufficiently "clear" delegation because that is the majority view. *See, e.g., Ins. Newsnet.com*, 2011 WL 3423081, at *3 ("The prevailing rule across jurisdictions is that incorporation by reference of rules granting the arbitrator the authority to decide questions of arbitrability—especially the American Arbitration Association 'AAA' rules—is clear and unmistakable evidence that the parties agreed to submit arbitrability questions to the arbitrators.") (cleaned up); *Way Servs.*, 2007 WL 1775393, at *4 (same); *Vertiv Corp.*, 2019 WL 1454953, at *2 ("Courts regularly find that agreements that incorporate arbitration rules that give the arbitrator the power to decide issues of arbitrability constitute clear and unmistakable evidence that the parties

---

*Mortgage, Inc.*, No. 18-12091, 2019 WL 2613265, at *6 (D.N.J. June 24, 2019); *Aerpio Pharm., Inc. v. Quaggin*, No. 18-794, 2019 WL 4717477, at *10 (S.D. Ohio Sept. 26, 2019), *report and recommendation adopted*, No. 18-794, 2019 WL 5455111 (S.D. Ohio Oct. 24, 2019); *Choice Hotels Int'l, Inc. v. TK Hosp. Grp., LLC*, No. 18-3364, 2019 WL 6324523, at *3 (D. Md. Nov. 26, 2019); *Insurance Newsnet.com, Inc. v. Pardine*, No. 11-cv-286, 2011 WL 3423081, *3 (M.D. Pa. Aug. 4, 2011); *Way Servs., Inc. v. Adecco N. Am., L.L.C.*, No. 06-cv-2109, 2007 WL 1775393, *4 (E.D. Pa. June 18, 2007).

intended the arbitrator to decide those issues.") (citation omitted); *Aerpio Pharm.*, 2019 WL 4717477, at *11 ("The overwhelming majority of federal courts to have addressed the issue have also held that an agreement by parties that their disputes shall be resolved by arbitration in accordance with the Rules of the AAA is 'clear and unmistakable' evidence that the parties intended to submit the question of arbitrability to the arbitrator.").

But is it so simple?  In the Court's view, the blanket rule emerging from these cases is inconsistent with the more nuanced approach directed by the Third Circuit—an approach that requires the Court to do more than scour the relevant contract for the magic letters "AAA."  *See Chesapeake*, 809 F.3d at 758 ("Having considered the language of the Leases, the nature and contents of the various AAA Rules, and the prior case law, we conclude that the Leases do not satisfy the onerous burden of overcoming the presumption in favoring of judicial resolution of the question of class arbitrability.").

Instead, to comply with *Chesapeake*, district courts must scrutinize the precise language of the arbitration clause at issue and ensure that it truly manifests a clear intent to delegate arbitrability to the arbitrator.  *Id.* at 762-63 ("Given the actual contractual language at issue here as well as the language and nature of the other AAA rules, the Supplementary Rules are not enough for us to conclude that the Leases clearly and unmistakably delegate the question of class arbitrability to the arbitrators."); *see also Herzfeld v. 1416 Chancellor, Inc.*, No. CIV.A. 14-4966, 2015 WL 4480829, at *6 (E.D. Pa. July 22, 2015) ("[W]e cannot find the three-word reference to AAA 'rules and regulations' incorporates a panoply of collective and class action rules applied by AAA once the matter is properly before the arbitrators by consent or waiver."), *aff'd*, 666 F. App'x 124 (3d Cir. 2016).  Thus, if a particular contract gives good reason to doubt that delegation was the parties' intent, questions of

arbitrability should remain with the Court, even if the contract incorporates the AAA rules as part of any arbitration.

Giving closer scrutiny to such provisions makes good sense. As a practical matter, when parties—even sophisticated ones—decide what arbitral forum they will insert into their contract, the somewhat esoteric issue of arbitrability is often the last thing they are considering. *See First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 945 (1995) ("[T]he former question—the 'who (primarily) should decide arbitrability' question—is rather arcane. A party often might not focus upon that question or upon the significance of having arbitrators decide the scope of their own powers."). Instead, factors such as fees, the roster of neutrals, availability of discovery, speed of decision, and the like are usually what drive them to pick one arbitral forum over another. Threshold jurisdictional considerations, relevant in only a subset of cases, simply aren't as important to most contracting parties.

As a result, there are good, practical reasons to doubt that every "incorporation" of AAA or other arbitration rules is *always* "clearly and unmistakably" intended to delegate arbitrability questions to an arbitrator. To assume that a reference to the AAA rules is always enough would "too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide." *Id.* (citation omitted).

Therefore, when examining this issue here, the Court will take the more cautious, textual approach that *Chesapeake* demands. *See Chesapeake*, 809 F.3d at 758. That requires the Court to start with the presumption that arbitrability is for the Court to decide, examine the relevant contractual language for potential ambiguities, and ultimately satisfy itself that the language of the parties' contract is an "unmistakable" delegation of

arbitrability to the arbitrator.  Here, the Court finds that AvMed has satisfied this "onerous" standard for five reasons.

*First*, the language of the arbitration clause in the License Agreement is broad.  Not only does it cover any dispute under the Agreement, but it extends to any dispute of "any kind" that arises "in connection with" or "relating to" the Agreement.  [ECF 21 at Ex. 1 § 11(e)].  A dispute over arbitrability could fall within, and is certainly a dispute "in connection with," the Agreement.  Of course, the presence of "a broadly worded arbitration clause is not enough, standing alone, to amount to clear and unmistakable evidence that the parties intended to arbitrate arbitrability."  *See Allstate Ins. Co. v. Toll Bros., Inc.*, 171 F. Supp. 3d 417, 426 n.8 (E.D. Pa. 2016) (citation omitted). But it is a starting point, because it at least does not foreclose the possibility that the parties intended to vest the arbitrator with the broadest possible jurisdiction.

In contrast, a narrower or qualified provision might suggest that parties intended the arbitrator's jurisdiction to be constrained in a way that would preclude the arbitration of arbitrability issues.  *See, e.g., Archer & White Sales, Inc. v. Henry Schein, Inc.*, 935 F.3d 274, 281–82 (5th Cir. 2019) ("The plain language incorporates the AAA rules—and therefore delegates arbitrability— for all disputes *except* those under the carve-out. Given that carve-out, we cannot say that the Dealer Agreement evinces a 'clear and unmistakable' intent to delegate arbitrability."); *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1031 (2d Cir. 2014) ("We have found the 'clear and unmistakable' provision satisfied where a broad arbitration clause expressly commits all disputes to arbitration, concluding that all disputes necessarily includes disputes as to arbitrability.") (citation omitted).

Thus, as a rule of thumb, a broad arbitration clause is more suggestive of an intent to arbitrate arbitrability than a narrow clause. And the clause at issue here is as broad as they come.

***Second***, the arbitration clause incorporates the AAA rules in a particularly clear and exhaustive manner. To begin with, it provides that the AAA "Commercial Arbitration Rules" shall apply, as opposed to merely referencing the AAA rules more generally. The AAA Commercial Arbitration Rules are a readily-identifiable set of 58 rules, distinguishing this clause from vague, general references to AAA rules that courts have found lacking. *Cf. Chesapeake*, 809 F.3d at 762–63 ("[B]efore we can even consider these Supplementary Rules, the 'daisy-chain' takes us from the Leases to the otherwise unspecified 'rules of the American Arbitration Association' to the Commercial Rules. The Commercial Rules do not even refer to the Supplementary Rules and are phrased in terms of basic procedural issues arising out of bilateral arbitration proceedings.").

The contracts here also specify that the version of the rules "then in effect" shall apply. This, too, is significant, because it removes any ambiguity about what version of the AAA rules applies. *Cf. DCK N. Am., LLC v. Burns & Roe Servs. Corp.*, 218 F. Supp. 3d 465, 474 (W.D. Pa. 2016) (Hornak, J.) ("[B]ecause it is … ambiguous which version of the Rules the parties intended to reference and what those particular Rules reveal, the parties cannot be said to have clearly and unmistakably provided for an arbitrator, rather than a court, to decide the question of arbitrability.").

On this point, Cavulus argues that there *is* ambiguity because it entered into the License Agreement with AvMed in 2008, while the AAA amended its rule governing the arbitrator's power to decide arbitrability, to include more explicit delegation language, in 2013. But this argument is unconvincing. To

begin with, even assuming there is an ambiguity about which version of the rules should apply, the 2013 amendments to the AAA rules did not meaningfully affect the arbitrator's power to decide his or her own jurisdiction. Indeed, "[s]ince at least 1998, the AAA Commercial Arbitration Rules have explicitly provided that that the arbitrator shall have the power to rule on his or her own jurisdiction." *loanDepot.com*, 2019 WL 2613265, at *7 (citation omitted).[5]

Furthermore, there is no ambiguity. It is clear that the 2013 version of the AAA rules apply. After executing their contract in 2008, the parties amended their agreements several times, including most recently in 2017. Thus, they executed the operative version of their agreement at a time when the 2013 version of the AAA rules was "then in effect," and so those are the rules that apply.

**Third**, the parties' contract avoids a common ambiguity that, in the Court's view, can make the mere incorporation of AAA Commercial Rule 7 insufficiently "clear" for delegation purposes. That is, AAA Rule 7 is, by itself, permissive. It provides that the arbitrator has the "power" to decide his or her jurisdiction, but it doesn't say (as some other arbitration rules do) that the arbitrator "shall" do so or that the arbitrator's power is "exclusive." Some courts have found this to be a problem, and the Court agrees. *See, e.g., In re: Zetia (Ezetimibe) Antitrust Litig.*, No. 2:18MD2836, 2018 WL 4677830, at *6 (E.D. Va. Sept. 6, 2018) ("Rule 7 of the AAA Commercial Rules incorporated in

---

[5] *See, e.g., Contec Corp. v. Remote Sol., Co., Ltd.,* 398 F.3d 205, 208 (2d Cir. 2005); *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012); *Fallo v. High–Tech Inst.*, 559 F.3d 874, 878 (8th Cir. 2009); *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366, 1372–73 (Fed. Cir. 2006)*; Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332–33 (11th Cir. 2005).

the MAD Agreements is permissive, not mandatory, … conferring jurisdiction on the arbitrator, but not requiring submission of such disputes by the parties."), *report and recommendation adopted*, 2018 WL 6795836 (E.D. Va. Dec. 6, 2018); *Ajamian v. CantorCO2e, L.P.*, 137 Cal. Rptr. 3d 773, 789 (Cal. Ct. App. 2012) ("This tells the reader almost nothing, since a court also has power to decide such issues, and nothing in the AAA rules states that the AAA arbitrator, as opposed to the court, *shall* determine those threshold issues, or has *exclusive* authority to do so, particularly if litigation has already been commenced."); *Doe v. Natt*, No. 2D19-1383, 2020 WL 1486926, at *7 (Fla. Dist. Ct. App. Mar. 25, 2020) ("This rule confers an adjudicative power upon the arbitrator, but it does not purport to make that power exclusive. Nor does it purport to contractually remove that adjudicative power from a court of competent jurisdiction.") (citation omitted).[6]

Thus, simply incorporating by reference a rule that permits an arbitrator concurrent authority with the Court, without clarifying that the arbitrator's authority is exclusive, may be insufficient to show the required "clear and unmistakable" intent.  But that is not a problem here because the parties' arbitration agreement separately makes clear that any dispute must be resolved "exclusively" through an arbitration governed by AAA rules.  The use of the word "exclusively" is powerful evidence in demonstrating unmistakable clarity regarding delegation.  *See Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010) (finding "clear and unmistakable" delegation of arbitrability

---

[6] *Cf. Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 456 (1984) (describing the phrase "Congress shall have the power" as "permissive."); *United States v. Riverbend Farms, Inc.*, 847 F.2d 553, 555 (9th Cir. 1988) ("The language of § 608a(7) is unambiguously permissive. Congress easily could have mandated a hearing, but instead stated that the Secretary 'shall have the power' to conduct such investigations.").

questions where clause provided that arbitrator "shall have exclusive authority to resolve any dispute relating to the . . . enforceability . . . of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable."); *Nandorf, Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 410 F. Supp. 3d 882, 888 (N.D. Ill. 2019) ("[A] robust delegation clause conferring power to the arbitrator suffices[.]")

**Fourth**, the License Agreement's references to the availability of equitable remedies and "judicial proceedings" do not create ambiguity. There is a provision in the arbitration clause that, for any breaches of the confidentiality provision (Section 7 of the License Agreement), the parties can also seek injunctive relief as a remedy. And the confidentiality provision in the license itself refers to judicial proceedings. Some courts have viewed references to judicial proceedings in the contract, such as a carve-out for injunctive relief, as creating ambiguity regarding delegation. *See, e.g.*, *Archer & White Sales,* 935 F.3d at 281–82 ("Given that carve-out, we cannot say that the Dealer Agreement evinces a 'clear and unmistakable' intent to delegate arbitrability."). But the way the provision is framed here, it creates no ambiguity. Rather, it authorizes the parties to obtain *additional* injunctive relief in court for violations of the confidentiality provision—it does not "carve out" arbitrability. [ECF 21 at Exs. 1 § 11(e) & 2 § 8] ("…therefore, the non-breaching party will be entitled to injunctive relief ***in addition to*** any other remedies provided by law or in equity for any such breach.") (emphasis added).

**Fifth**, Cavulus is a sophisticated commercial entity and, presumably, the drafter of the arbitration clause in its own contracts. Some courts have found that the incorporation of AAA rules is not a "clear and unmistakable" delegation of arbitrability issues when one of the contracting parties is unsophisticated. *See, e.g., Toll Bros.*, 171 F. Supp. 3d at 428 ("[I]ncorporating

forty pages of arbitration rules into an arbitration clause is tantamount to inserting boilerplate inside of boilerplate, and to conclude that a single provision contained in those rules amounts to clear and unmistakable evidence of an unsophisticated party's intent would be to take 'a good joke too far.'") (citation omitted); *Chong v. 7-Eleven, Inc.*, No. CV 18-1542, 2019 WL 1003135, at *10 (E.D. Pa. Feb. 28, 2019).[7] Here, however, Cavulus cannot argue that it lacked sufficient sophistication when it incorporated the AAA commercial rules into its arbitration clause. As a result, this concern is simply not present here.

Based on these considerations, the Court is persuaded that the incorporation of AAA rules is, in *this* contract, a sufficiently "clear and unmistakable" delegation of arbitrability to satisfy AvMed's "onerous" burden of showing that the parties agreed to arbitrate those issues.

In sum, then, the Court holds as follows with respect to AvMed: (1) AvMed is subject to personal jurisdiction in this Court; (2) AvMed, by its own admission, entered into a valid and enforceable arbitration agreement with Cavulus; and (3) the parties' arbitration agreement "clearly and unmistakably" delegated questions of arbitrability to the arbitrator. The Court will therefore compel AvMed to participate in arbitration, but leave any objections to the arbitrability of specific claims for the arbitrator to resolve.[8]

---

[7] *See also Richardson v. Coverall N. Am., Inc.*, No. 18-532, 2018 WL 4639225, at *4 (D.N.J. Sept. 27, 2018); *Calzadillas v. Wonderful Co., LLC*, No. 1:19-CV-00172, 2019 WL 2339783, at *4 (E.D. Cal. June 3, 2019); *Meadows v. Dickey's Barbecue Restaurants Inc.*, 144 F. Supp. 3d 1069, 1078 (N.D. Cal. 2015).

[8] Cavulus complains that AvMed pulled a fast one in this case, by getting Cavulus to agree to stay the pending arbitration while this Court decided the present motion. Cavulus argues that implicit in that agreement was that AvMed was consenting to this Court deciding all arbitrability disputes. Cavulus, though, cites nothing in the record to support this alleged *quid pro*

## II.   NTT is bound to the arbitration agreement by equitable estoppel and its acceptance of the browsewrap End-User Agreement.

Unlike AvMed, NTT disputes the very existence of an agreement to arbitrate.  It argues that it did not agree to arbitrate anything at all, because it was not a signatory to the License or End-User Agreements.  This is a challenge to the *existence* of an arbitration agreement, and so is for the Court to decide.  *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) ("To be sure, before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists.") (citation omitted); *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 112 (3d Cir. 2000) ("[W]hen the very existence of such an agreement is disputed, a district court is correct to refuse to compel arbitration until it resolves the threshold question of whether the arbitration agreement exists.").

Broadly speaking, NTT is correct that "[a]rbitration is strictly a matter of contract," and that "[i]f a party has not agreed to arbitrate, the courts have no authority to mandate that [it] do so." *Bel-Ray Co. v. Chemrite (Pty.) Ltd.*, 181 F.3d 435, 444 (3d Cir. 1999) (citation omitted).  But there's a bit more to it than that.  A party can also be "compelled to arbitrate under an agreement, even if he or she did not sign that agreement, if common law principles of agency and contract support such an obligation on his or her part." *Bouriez v. Carnegie Mellon Univ.*, 359 F.3d 292, 294 (3d Cir. 2004) (citation omitted).  Thus, an arbitration clause can be "enforced by or against nonparties through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel." *White v. Sunoco, Inc.*, 870 F.3d 257, 262 (3d Cir. 2017).

---

*quo.*  In any event, to the extent that Cavulus wants to press such an argument, it should do so before the arbitrator.

Cavulus identifies at least three potential reasons why it believes NTT should be bound to the arbitration clause here: (1) NTT was AvMed's agent under the Agreements; (2) equitable estoppel applies; and (3) NTT accepted the End-User Agreement by accessing and using Cavulus's software in the face of an enforceable browsewrap contract. The Court will compel NTT to arbitrate based on the second and third reasons.[9]

---

[9] Because NTT is bound to the arbitration agreement based on equitable estoppel and its actual acceptance of the End-User Agreement, the Court will decline to decide whether NTT might also be bound based on Cavulus's "agency" theory.

The Court notes that existing Third Circuit law is seemingly inconsistent with respect to whether and when a non-signatory agent may be bound to its principal's arbitration agreement. *Compare Pritzker v. Merrill Lynch*, 7 F.3d 1110, 1121 (3d Cir. 1993) ("Because a principal is bound under the terms of a valid arbitration clause, its agents, employees, and representatives are also covered under the terms of such agreements.") (citation omitted) *with Bel-Ray*, 181 F.3d at 444 (suggesting that *Pritzker* is limited to circumstances where a non-signatory agent of a signatory seeks to compel the other signatory of an arbitration agreement to arbitrate its claims against the non-signatory) *with DuPont*, 269 F.3d at 198-199 (suggesting that "[t]raditional principles of agency law may ***bind*** a non-signatory to an arbitration agreement" and describing *Pritzker* as "b[inding]" an agent to the principal's arbitration agreement.") (emphasis added).

This ambiguity has led to inconsistent application of *Pritzker* in the district courts. *Compare Neal v. Asta Funding, Inc.,* No. 13-6981, 2016 WL 3566960, at *18 (D.N.J. June 30, 2016) ("The rule set forth in *Pritzker*" applies "only … when a non-signatory seeks to invoke the arbitration agreement entered into by its principal, rather than the other way around when a non-signatory seeks to avoid the arbitration agreement.") *with Just B Method, LLC v. BSCPR, LP,* No. CIV.A. 14-1516, 2014 WL 5285634, at *8 (E.D. Pa. Oct. 14, 2014) ("Under the agency theory in the arbitration context … a non-signatory person to an arbitration agreement can be compelled to arbitrate.").

These decisions cannot be easily reconciled, because any case where an agent is "bound" by a court to its "principal's arbitration agreement" (approved of by *DuPont*) is, by definition, a case where an arbitration agreement is being enforced against a non-signatory agent (disapproved of by *Bel-Rey*). In the

## A. NTT is bound to the arbitration agreement by equitable estoppel.

Equitable estoppel bars NTT from refusing to arbitrate because NTT accepted a "direct benefit" from Cavulus's agreements with AvMed, namely, a license to access Cavulus's proprietary software, which NTT needed to perform its work for AvMed.

Equitable estoppel "bind[s] a non-signatory to an arbitration clause when that non-signatory has reaped the benefits of a contract containing an arbitration clause." *Invista*, 625 F.3d at 84 (citation omitted). This "prevents a non-signatory from 'cherry-picking' the provisions of a contract that it will benefit from and ignoring other provisions that don't benefit it or that it would prefer not to be governed by (such as an arbitration clause)." *Id.* (citation omitted).

To determine whether equitable estoppel applies here, the Court looks to state contract law. *See Sanford*, 618 F. App'x at 118 ("Arbitration provisions may be enforced against non-signatories under the doctrine of equitable estoppel if the relevant state contract law recognizes that principle as a ground for enforcing contracts against third parties.") (cleaned up). The Third Circuit has held that "Pennsylvania law allow[s] non-signatories to be bound to an arbitration agreement" by equitable estoppel "when the non-signatory knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement." *Griswold v. Coventry First LLC*, 762 F.3d 264, 271-72 (3d Cir. 2014) (quotations and citations omitted). A non-signatory "knowingly exploits" an agreement "(1) by knowingly seeking and obtaining direct benefits from that contract; or (2) by seeking to enforce terms of that

_____

absence of further guidance from the Third Circuit, the Court sees no need to wade into this issue here, since there are two other independent and sufficient bases for compelling NTT to arbitrate.

contract or asserting claims based on the contract's other provisions." *Id.* at 272 (quotations and citations omitted).

NTT argues that equitable estoppel does not apply because NTT has "never asserted in any forum that it was a party to the [License and End-User Agreements] or sought to enforce the terms of either contract against Cavulus." [ECF 28 at p. 11]. But it is the first category of estoppel—seeking and obtaining "direct benefits" from a contract—that is relevant here; not estoppel based on any attempt by NTT to "enforce terms of that contract or asser[t] claims based on the contract's other provisions." *Griswold*, 762 F.3d at 272.

The first category encompasses cases "involv[ing] non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract." *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber and Resin Intermediates, S.A.S.*, 269 F.3d 187, 200 (3d Cir. 2001) (citation omitted); *see also Benincasa v. Jack Daniels Audi of Upper Saddle River, Inc.*, No. 17-6322, 2018 WL 2215517, at *4 n.5 (D.N.J. May 15, 2018) ("A person may be bound to an arbitration agreement where he or she has accepted benefits under the contract.") (citations omitted).

Courts have applied this theory of estoppel where non-signatories to a contract seek to avoid arbitration clauses after accepting all manner of benefits flowing directly from signatories' performance of that contract. For example, non-signatories have been compelled to arbitrate where they have accepted benefits such as: (1) "significantly lower insurance rates," *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999); (2) "the ability to sail under the French flag," *id.*; (3) "having custom-made Amkor chips made available," *Amkor Tech., Inc. v. Alcatel Bus. Sys.*, 278 F. Supp. 2d 519, 523 (E.D. Pa. 2003); (4) "continuing use of the name 'Deloitte,'" *Deloitte*

*Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993); (5) the subsequent "license of … relevant trademarks" contemplated by an asset purchase agreement with an arbitration clause, *Life Techs. Corp. v. AB Sciex Pte. Ltd.*, 803 F. Supp. 2d 270, 277 (S.D.N.Y. 2011); and (6) "promissory notes" issued pursuant to a Distribution Agreement. *Fencourt Reinsurance Co. v. ITT Indus., Inc.*, No. CIV.A. 06-4786, 2008 WL 2502139, at *10 (E.D. Pa. June 20, 2008).

Here, NTT received a "direct benefit" from AvMed's License and End-User Agreements, in the form of a license to access Cavulus's software to perform its work for AvMed.  Cavulus conditioned AvMed's access to its software on acceptance of the License Agreement.  That Agreement contemplated that AvMed might grant sublicenses to agents or contractors, such as NTT, but permitted it to do so only if sublicensees were also "bound for the benefit of [Cavulus] to the terms of the End-User Agreement … by executing a 'click-on' version of the same agreement."  [ECF 21-1 at § 1(a)]. The License Agreement expressly did not permit any other "sublicense, distribution or disclosure" of Cavulus's software by AvMed.  [*Id.* at § 1(b)].

Thus, when AvMed sublicensed access to NTT, it was conferring on NTT a benefit that had been specifically contemplated by the License Agreement, and which AvMed only had a right to confer because the Agreement granted it that right.  The sublicense was therefore a "direct" benefit flowing to NTT from the contract itself.  *See Life Techs.*, 803 F. Supp. 2d at 274 ("The benefits must be direct—which is to say, flowing directly from the agreement.").

And NTT knowingly accepted that benefit without objection.  AvMed copied two NTT executives on the "Limited Letter of Agency" it sent to Cavulus, which represented that NTT was "authorized to act on behalf of AvMed with regard to the products and/or services that are owned, leased, or licensed by

- 31 -

AvMed," including "supporting and operating the products and/or services provided to AvMed from [Cavulus] … under the current agreement(s) … between [Cavulus] and [AvMed]." [ECF 21-6].  NTT never disputed or objected to this purported delegation of authority to act on AvMed's behalf "under the current agreement(s) … between [Cavulus] and [AvMed]." [*Id.*].  Far from it. NTT acted fully in accordance with this letter, accessing Cavulus's platform to perform work on AvMed's behalf.  [ECF 21 at ¶ 32].  And each time NTT's employees accessed Cavulus's log-in page, they clicked past a warning that their use of the software constituted "acceptance" of the End-User Agreement. [*Id.* at ¶¶ 33-36].

In short then: (1) Cavulus conditioned AvMed's license to use its software on AvMed's acceptance of the Agreements and their arbitration clauses; (2) as contemplated by the License Agreement, AvMed sublicensed its access rights to NTT; and (3) NTT directly reaped the benefits of that sublicense by using Cavulus's software to perform paid work for AvMed.  Moreover, accepting Cavulus's allegations as true (which the Court must at this stage), NTT also exploited that access to copy and steal Cavulus's "customized and proprietary workflows and functionalities." [*Id.* at ¶ 43].

Principles of equity do not permit NTT to enjoy and exploit the benefits of the License and End-User Agreements' access provisions, while ignoring their arbitration clause when legal claims arise from that access.  The Court will thus estop NTT from denying that it is bound by the arbitration clause.

### B.   NTT accepted the browsewrap End-User Agreement by accessing and using Cavulus's software.

Separately, NTT is also bound to arbitrate Cavulus's claims because it independently accepted the End-User Agreement by using Cavulus's software in the face of a conspicuous browsewrap agreement.

Of course, actual acceptance of a written contract containing an arbitration clause would create an enforceable arbitration agreement. *See Cascades Tissue Grp. Pa., Inc. v. United Steel, Paper, & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union*, 119 F. Supp. 3d 307, 313 (E.D. Pa. 2015) ("[T]he court must assess an arbitration clause like any other contract term.") (citation omitted).   Relatedly, "non-signatories may assume the obligations contained in an arbitration clause" where "subsequent conduct indicates that [the non-signatory] is assuming the obligation to arbitrate." *Invista*, 625 F.3d at 85 (quotations and citations omitted); *see also Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 777 (2d Cir. 1995) ("In the absence of a signature, a party may be bound by an arbitration clause if its subsequent conduct indicates that it is assuming the obligation to arbitrate.") (citation omitted).

Here, Cavulus argues that NTT accepted the End-User Agreement, including the arbitration provision, each time its employees accessed and used Cavulus's software to perform their work for AvMed.   This is because the secure log-in page of Cavulus's software "states that '[u]se of Cavulus constitutes acceptance of the <u>End User License Agreement</u>,' and contains a hyperlink to the terms" of that Agreement, including its arbitration provision. [ECF 27 at p. 5].   Cavulus contends that this language is a so-called "browsewrap" agreement and that it is enforceable against NTT.  [*Id.* at p. 15]. NTT responds that (1) the browsewrap agreement is unenforceable; and (2) in any event, the NTT employees who accessed the Cavulus software lacked the authority to bind NTT to the End-User Agreement.  [ECF 28 at pp. 13-19].

Upon consideration, the Court agrees with Cavulus that the browsewrap agreement is enforceable, and that NTT accepted it.

### i.    The browsewrap agreement is enforceable.

The link to the End-User Agreement on Cavulus's log-in page creates an enforceable browsewrap agreement.[10] "In browsewrap agreements, a company's terms and conditions are generally posted on a website via hyperlink at the bottom of the screen." *James v. Glob. TelLink Corp*, 852 F.3d 262, 267 (3d Cir. 2017).  However, "[u]nlike online agreements where users must click on an acceptance after being presented with terms and conditions (known as 'clickwrap' agreements), browsewrap agreements do not require users to expressly manifest assent." *Id.* (citation omitted).  Instead, "in a pure-form browsewrap agreement, the website will contain a notice that—by merely using the services of, obtaining information from, or initiating applications within the website—the user is agreeing to and is bound by the site's terms of service." *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 837 (S.D.N.Y. 2012) (cleaned up).

The Third Circuit has suggested that browsewrap agreements are enforceable if "the terms are reasonably conspicuous on the webpage" so that

---

[10] NTT's attack on the entire browsewrap agreement does not, in this circumstance, sidestep the usual rule that a challenge to an otherwise controlling arbitration agreement "must focus exclusively on the arbitration provision, rather [than on] the contract as a whole." *S. Jersey Sanitation Co., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 840 F.3d 138, 143 (3d Cir. 2016).  That is because "a challenge to a contract on the grounds that the signatory was unauthorized to sign it must be decided by a court, even if the contract contains an arbitration clause, because it is a challenge to a contract's formation rather than its validity." *SBRMCOA, LLC v. Bayside Resort, Inc.*, 707 F.3d 267, 271 (3d Cir. 2013); *see also Sandvik AB*, 220 F.3d at 107 ("[W]e draw a distinction between contracts that are asserted to be 'void' or non-existent, as is contended here, and those that are merely 'voidable' … for purposes of evaluating whether the making of an arbitration agreement is in dispute."); *Sphere Drake Ins. Ltd. v. All Am. Ins. Co.*, 256 F.3d 587, 591 (7th Cir. 2001) (". . . [A]n argument that the contract does not exist can't logically be resolved by the arbitrator[.]").

the user can be fairly charged with "constructive notice" that continued use will constitute acceptance of the agreement. *James*, 852 F.3d at 267; *see also Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 233 (2d Cir. 2016) ("In determining the validity of browsewrap agreements, courts often consider whether a website user has actual or constructive notice of the conditions.") (citation omitted); *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014) ("[T]he validity of the browsewrap agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract.") (citation omitted).

Although the enforceability of web-based agreements will often depend on a "fact-intensive inquiry," the Court may determine that a web-based agreement to arbitrate exists where notice of the agreement was "reasonably conspicuous and manifestation of assent unambiguous as a matter of law." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 76 (2d Cir. 2017) (citation omitted). Importantly, in assessing whether a party manifested an intent to enter a contract, the Court looks not to inward, subjective intent but, rather, to the "intent a reasonable person would apprehend in considering the parties' behavior." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 582 (3d Cir. 2009) (citation omitted). In other words, "a true and actual meeting of the minds is not necessary to form a contract." *Id.* (quotations and citations omitted). As a result, "an internet user need not actually read the terms and conditions or click on a hyperlink that makes them available as long as she has notice of their existence." *Nicosia*, 834 F.3d at 232 (citation omitted).

In the context of browsewrap agreements, courts have typically found that continued use of a website is a sufficient manifestation of intent where the website "contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound." *James*, 852 F.3d at 267. On

the other hand, "when terms are linked in obscure sections of a webpage that users are unlikely to see, courts have refused to find constructive notice." *Id.*

Here, the relevant browsewrap language is found on the log-in page of Cavulus's software platform.  Cavulus attaches a screenshot of the log-in page to its complaint as an exhibit, and NTT does not dispute the screenshot's authenticity.  [ECF 21 at Ex. 7].  The log-in page consists of a box to type in a user ID and password and then, about one inch below that box, a sentence reading: "Use of Cavulus constitutes acceptance of the <u>End User License Agreement</u>," containing a hyperlink to the Agreement itself.  [*Id.*].  This language was displayed every time an NTT employee (or other user) logged on to the software.  Cavulus alleges that nine NTT employees logged on more than 75 times, and NTT does not dispute that it performed work for AvMed that required it to access Cavulus's platform.  A screenshot is pasted below:



NTT argues that the browsewrap End-User Agreement is not sufficiently "conspicuous" to be enforced, because the link to the End-User Agreement is "in small font, positioned close to a large paragraph of text in the same small font, and is far enough below the log-in boxes and button so as not to command the viewer's attention." [ECF 28 at p. 15]. The Court cannot agree with this characterization. The link to the End-User Agreement appears no more than an inch below the log-in boxes, and it is both above and set apart from the "large paragraph" of text NTT references (which is itself only six sentences long). The link is not concealed at the bottom of a webpage or hidden in fine print. What's more, the blue hyperlink to access the full End-User Agreement stands out against the white background of the log-in page and appears in a sentence which straightforwardly advises the user that "[u]se of Cavulus constitutes acceptance" of the linked agreement.

Indeed, other courts have found similar browsewrap agreements to be reasonably conspicuous and thus enforceable. *See, e.g.*, *Snap-on Bus. Sols. Inc. v. O'Neil & Assocs., Inc.*, 708 F. Supp. 2d 669, 683 (N.D. Ohio 2010) (enforcing browsewrap agreement where "[e]ach website contains a single page access screen where users must input a user name and password and then click an 'Enter' button to proceed … [and] [b]elow the 'Enter' button, the page states: 'The use of and access to the information on this site is subject to the terms and conditions set out in our legal statement.'"); *Freeplay Music, LLC v. Dave Arbogast Buick-GMC, Inc.*, No. 3:17-CV-42, 2019 WL 4647305, at *11 (S.D. Ohio Sept. 24, 2019) ("…FPM's home page displayed a visible link that read: '[t]o learn how you can use Freeplay music click on Terms of Use, Licensing, Rate Card.' … FPM website users did not have to scroll to find the link for the terms of use. The link is easily visible in the upper left-hand corner of the home page."); *Ticketmaster L.L.C. v. RMG Techs., Inc.*, 507 F.Supp.2d 1096, 1107

(C.D. Cal. 2007) (plaintiff was "highly likely to succeed in showing that Defendant received notice of the Terms of Use and assented to them by actually using the website," where site displayed a warning that "Use of this website is subject to express Terms of Use " and "[t]he underlined phrase 'Terms of Use' is a hyperlink to the full Terms of Use"); *Ticketmaster Corp. v. Tickets.Com, Inc.*, No. CV997654, 2003 WL 21406289, at *2 (C.D. Cal. Mar. 7, 2003) (finding browsewrap agreement enforceable where Ticketmaster "placed in a prominent place on the home page the warning that proceeding further binds the user to the conditions of use."); *Cairo, Inc. v. Crossmedia Servs., Inc.*, No. C 04-04825, 2005 WL 756610, at *2 (N.D. Cal. Apr. 1, 2005) (enforcing forum-selection clause of browsewrap agreement displayed near defendant's logo on web-page which stated: "By continuing past this page and/or using this site, you agree to abide by the Terms of Use for this site, which prohibit commercial use of any information on this site.").

Moreover, because the explicit warning that "use" of the software "constitutes acceptance" appears directly below the log-in button, the language arguably functions more like a "clickwrap" agreement than a traditional browsewrap agreement—perhaps falling somewhere between the two. That is, while Cavulus does not ask its users to check an "I Accept" box, as is the case with a typical clickwrap agreement, the placement of an explicit warning directly below a log-in button has a similar psychological effect. And clickwrap agreements are routinely enforced by the courts. *See Meyer,* 868 F.3d at 75 ("Courts routinely uphold clickwrap agreements[.]") (citation omitted).[11] Thus,

---

[11] *See also Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033 (7th Cir. 2016) ("Courts around the country have recognized that this type of electronic 'click' can suffice to signify the acceptance of a contract.") (citation omitted); *Feldman v. Google, Inc.,* 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007) ("Absent a showing of fraud, failure to read an enforceable clickwrap agreement, as with any binding

while not strictly "clickwrap," the agreement here similarly avoids the concerns regarding lack of notice and manifested assent that often lead courts to decline to enforce pure browsewrap agreements buried "in obscure sections of a webpage that users are unlikely to see[.]" *James*, 852 F.3d at 267.

For these reasons, the Court finds that the browsewrap version of Cavulus's End-User Agreement is enforceable, and thus would be accepted by anyone proceeding past Cavulus's log-in screen and using its software in the face of that language.

### ii.   NTT is bound by its employees' notice and acceptance of the browsewrap End-User Agreement.

The Court rejects NTT's argument that it cannot be bound by its employees' notice and acceptance of the browsewrap End-User Agreement because those employees "were not authorized to bind [NTT]." [ECF 28 at p. 14]. NTT suggests that the browsewrap agreement, if it is enforceable, binds only "the person logging into the program, not any entity" they might be affiliated with. NTT says that the agreement unambiguously applies to the user ("you"), not to the user's company. [*Id.* at pp. 12-13]. NTT further argues that under its own corporate policies, its employees were not given authorization to bind the company. [*Id.* at p. 13]. The Court credits all of NTT's assertions as true, as well as NTT's interpretation of the End-User Agreement. In the end, though, all of this is immaterial. Under settled principles of agency law, because NTT's employees were acting within the scope of their employment, their conduct bound their employer, NTT.

It is well-established that "principals generally are responsible for the acts of agents committed within the scope of their authority." *Belmont v. MB*

---

contract, will not excuse compliance with its terms.") (citation omitted); *Zabokritsky*, 2019 WL 2563738, at *3 (same).

*Inv. Partners, Inc.*, 708 F.3d 470, 494 (3d Cir. 2013) (quotations and citations omitted). Relatedly, "[k]nowledge of an agent, acting with [sic] the scope of his authority, real or apparent, may be imputed to the principal, and thus, knowledge of the agent is knowledge of the principal." *V-Tech Servs., Inc. v. St.*, 72 A.3d 270, 279 (Pa. Super. Ct. 2013) (citation omitted); *see also* Restatement (Third) Of Agency § 5.03 ("For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal[.]"). The question here is whether these bedrock principles of agency law bind NTT to the browsewrap agreement that its employees assented to by using Cavulus's software to perform work for NTT.

The Eleventh Circuit's recent decision in *Dye v. Tamko Bldg. Prod., Inc.*, 908 F.3d 675 (11th Cir. 2018) provides persuasive guidance consistent with Pennsylvania law. In *Dye*, a group of plaintiff-homeowners, who had hired roofers to purchase and install shingles on their home, brought a putative class action against a manufacturer of roofing shingles. *Id.* at 679. The shingles at issue in the case had been purchased for the homeowners by their hired roofers. *Id.* at 684.

After the lawsuit was filed, the manufacturer moved to compel the homeowners to arbitrate, relying on a product-purchase agreement "display[ed] on the exterior wrapping of every package of shingles" bought by the roofers. *Id.* at 678. The Eleventh Circuit analogized this agreement to the sort of web-based "wrap" contracts at issue here, deeming it, "for lack of a better label," a "shinglewrap" agreement. *Id.* To avoid arbitration, the homeowners in *Dye* made an argument that closely mirrors NTT's argument here. Like NTT, the homeowners claimed that it was their agents (the roofers),

and not them, who "ordered, opened, and installed the shingles" wrapped in the alleged arbitration agreement. *Id.* Thus, the homeowners argued that "[e]ven if this was a valid means of making an offer, they didn't accept it—their roofers did." *Id.* at 684.

The Eleventh Circuit rejected this argument. It held that "[i]mputing the roofers' notice and acceptance of [the manufacturer's] purchase terms to the homeowners . . . fits squarely within established agency-law principles and precedent." *Id.* More specifically, the court explained that any grant of agency authority "necessarily implies the authority to do acts that are incidental to it, usually accompany it, or are reasonably necessary to accomplish it," and that "knowledge or notice that an agent acquires while acting within the course and scope of his authority is generally imputed to his principal." *Id.* (cleaned up). Applying these principles, the court held that, because the homeowners "expressly delegated to their roofers the task of purchasing shingles," the law would not permit them to "contest terms—in particular, those requiring mandatory arbitration—that are part and parcel of that purchase." *Id.* Relatedly, knowledge of the "shinglewrap" agreement was "properly imputed to [the homeowners]" because the roofers received notice "while acting within the scope of their authority to purchase and install the shingles" on behalf of the homeowners. *Id.* at 686.

Pennsylvania agency law compels the same conclusion here. Under Pennsylvania law, "[t]he basic elements of agency are the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking[,] and the understanding of the parties that the principal is to be in control of the undertaking." *V-Tech*, 72 A.3d at 278. Like Florida law, Pennsylvania law recognizes that agents have "implied authority" to take actions that are "proper, usual and necessary to carry out express agency."

*Petersen v. Kindred Healthcare, Inc.*, 155 A.3d 641, 645 (Pa. Super. Ct. 2017) (cleaned up).  And like Florida law, Pennsylvania law holds that "knowledge of the agent is knowledge of the principal" when such knowledge is acquired by the agent, "acting with [sic] the scope of his authority, real or apparent[.]"  *V-Tech*, 72 A.3d at 279 (citation omitted); *see also* Rest. (Third) Of Agency § 5.03.

Applying these principles here, both the reasoning of *Dye* and corresponding Pennsylvania law support holding NTT to the End-User Agreement, based on its employees' access to and use of Cavulus's software in the face of a conspicuous browsewrap agreement.  NTT does not suggest that its employees accessed the software for any reason other than to perform NTT's work for AvMed, and each time they did so they clicked past the browsewrap agreement—which, as discussed, is enforceable.  So just as the homeowners in *Dye* could not direct their roofer-agents to purchase shingles, but then disavow the standard terms attached to that purchase, NTT cannot direct its employees to access Cavulus's software to perform its contract with AvMed, but then disavow the terms on which Cavulus conditions that access.

Simply put, (1) Cavulus was free to impose lawful terms-of-use on its own software; (2) those terms were made reasonably conspicuous to NTT employees by browsewrap language on the secure log-in page; and (3) the employees' acceptance of those terms was "incidental to" or "reasonably necessary to accomplish" their assigned task of accessing Cavulus's software and transferring AvMed's customer data.  *Dye*, 908 F.3d at 685; *see also Petersen*, 155 A.3d at 645.

To be clear, this is not to say that NTT would be bound by every nominally enforceable browsewrap agreement its employees might encounter when they access a website from their work computers.  The agreement here binds NTT because NTT, as reflected by AvMed's Limited Letter of Agency,

directed its employees to access Cavulus's software in order to perform the work required by NTT's contract with AvMed.  By directing and permitting its employees to access Cavulus's software, NTT, as a matter of agency law, authorized them to take any incidental actions "proper, usual and necessary" to complete that assignment.  *Petersen*, 155 A.3d at 645.  Surely, if anything is incidental to the use of a software program, it is accepting the corresponding terms and conditions of using that software.  Such terms are ubiquitous in the internet age.

Additionally, as in *Dye*, the notice of the browsewrap agreement received by NTT's employees while performing their work is fairly imputed to NTT.  *See Dye*, 908 F.3d at 685; *V-Tech*, 72 A.3d at 279.  And "[b]ecause the notice that [NTT's employees] acquired while acting within the scope of their authority to [access the Cavulus platform and transfer AvMed's data] is properly imputed to [NTT], [NTT] cannot now plead ignorance of the [End-User Agreement's] existence." *Dye*, 908 F.3d at 686.

These conclusions seem necessary.  After all, "a corporation is an artificial legal entity which can act only through its employees." *Michael Carbone, Inc. v. Gen. Acc. Ins. Co.*, 937 F. Supp. 413, 423 (E.D. Pa. 1996); *see also Tayar v. Camelback Ski Corp.*, 47 A.3d 1190, 1196 (Pa. 2012) ("[A] corporation can only act through its officers, agents, and employees.") (citation omitted).  Thus, "acts of … employees within the scope of their employment" are generally considered "a lesser included subset within the set of the company's actions." *Michael Carbone*, 937 F. Supp. at 423.

If it were otherwise, companies would never be bound by browsewrap or other web-based agreements accepted by ordinary employees, even when those employees are acting squarely within the scope of their employment.  Instead, companies would be bound only when a CEO or other high-ranking executive

with unilateral authority to make contracts on behalf of the company assented to a browsewrap agreement. Yet that is clearly not how the law surrounding such agreements has developed. *See, e.g.*, *Andra Grp., LP v. BareWeb, Inc.*, No. 4:17-CV-00815, 2018 WL 2848985, at *7 n. 4 (E.D. Tex. June 11, 2018) ("BareWeb was bound by the browsewrap TOU Agreement since its employees allegedly visited HerRoom's website, BareWeb uses a similar browsewrap agreement on its own website, and Andra's claims are covered by the TOU Agreement."); *Freeplay Music, LLC v. Dave Arbogast Buick-GMC, Inc.*, No. 3:17-CV-42, 2019 WL 4647305, at *1, *10-11 (S.D. Ohio Sept. 24, 2019) (enforcing browsewrap agreement against Arbogast where "[a]n Arbogast employee, David Novotny, who was responsible for developing the advertisements, accessed the website and downloaded music to a folder by right-clicking his selections."); *Sw. Airlines Co. v. BoardFirst, L.L.C.*, No. 3:06-CV-0891-B, 2007 WL 4823761, at *1 (N.D. Tex. Sept. 12, 2007) (enforcing browsewrap agreement against BoardFirst where "BoardFirst employees log on to the 'Check In and Print Boarding Pass' page of the Southwest site and check the customer in using his personal information."); *Reis, Inc. v. Spring11 LLC*, No. 15 CIV. 2836, 2016 WL 5390896, at *13 (S.D.N.Y. Sept. 26, 2016) ("Whether Spring11 is contractually bound by the Terms of Service depends whether Spring11's employees had actual or constructive knowledge of the site's terms and conditions, and manifested assent to them.") (cleaned up).

For all these reasons, the Court holds that NTT accepted the End-User Agreement, including its arbitration clause, through its employees' access and use of Cavulus's software platform in the scope of their duties and in the face of a conspicuous browsewrap agreement. Along with equitable estoppel, this provides a basis for compelling NTT to arbitrate.

### III. The Court will dismiss, rather than stay, the remainder of this case pending arbitration.

Finally, having decided that a valid arbitration agreement exists between Cavulus and each Defendant, and that any objections to the arbitrability of specific claims must be resolved by the arbitrator, the Court must decide whether to stay or dismiss what remains of the case (*i.e.*, the claims Cavulus has pled "in the alternative") after referring the parties to arbitration.

Under 9 U.S.C. § 3, the Court always has the power to stay court proceedings for any claim referable to arbitration until arbitration is complete. And the FAA "affords a district court no discretion to dismiss a case where one of the parties applies for a stay pending arbitration." *Lloyd v. HOVENSA, LLC*, 369 F.3d 263, 269 (3d Cir. 2004). That said, if neither party requests a stay, the Court may dismiss the case after compelling arbitration. *See, e.g.*, *Somerset*, 832 F. Supp. 2d at 490 ("[N]either plaintiffs nor defendants have requested that we stay the action pending arbitration. We will accordingly dismiss plaintiffs' amended complaint and close this case.").

Here, after entering judgment in favor of Cavulus on Count 1 of the amended complaint (seeking to compel arbitration), the Court will dismiss the remaining claims because neither party has requested a stay and, in any event, Cavulus has asserted no claims that would warrant imposition of a stay. Indeed, the only substantive claims in Cavulus's complaint are pled "in the alternative" if "arbitration is not compelled against NTT." [ECF 21 at ¶¶ 72-84]. The Court has compelled arbitration against NTT, and thus concludes that its work here is done. Dismissal is therefore the appropriate course.

## **<u>CONCLUSION</u>**

For all these reasons, Cavulus's motion is granted insofar as it seeks an order compelling both NTT and AvMed "to participate in the arbitration proceeding commenced by Cavulus." [ECF 21 at ¶ 71]. But any objections to the arbitrability of Cavulus's specific claims must be resolved by the arbitrator.

A corresponding order follows.

DATED: April 28, 2020                              BY THE COURT:

                                                                    /s/ *J. Nicholas Ranjan*
                                                                    United States District Judge